UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-60760-CIV-DIMITROULEAS/SNOW

CHRISTIAN ALICEA,

      Plaintiff,

      vs.

KILOLO  KIJAKAZI, ACTING
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

      This cause is before the Court on Plaintiff's Complaint seeking judicial review of a final decision of the Social Security Administration denying the Plaintiff's application for disability benefits.  The Complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 401, et seq., and was referred to United States Magistrate Judge Lurana S. Snow for Report and Recommendation.

## I. PROCEDURAL HISTORY

      The Plaintiff filed an application for disability benefits on March 5, 2020, and an application for Supplemental Security Income (SSI) benefits on March 9, 2020, alleging in both applications disability since February 5, 2020, as a result of mental impairments.  The application was denied initially and upon reconsideration.  The Plaintiff then requested a hearing, which was held before Administrative Law Judge Sylvia Alonso on November 30, 2020.  The Administrative Law Judge (ALJ) found that the Plaintiff was not disabled within the meaning of the Social Security Act.  The Appeals Council denied the Plaintiff's request for review on February 10, 2021.  The

Plaintiff then filed this action seeking judicial review of the decision of the Commissioner.

## II. FACTS

The Plaintiff was born on March 21, 1974 and completed the 11th grade. His past jobs were as a maintenance worker, porter and landscape laborer. The Plaintiff has not worked since he was terminated from his last job in 2013. (R:50-54, 90)

The medical record reflects that on January 4, 2020, the Plaintiff presented for medication refills to Jacqueline Valle, a staff member at the office of Maria Arguello, M.D., the Plaintiff's primary care physician.[1] Physical examination of the Plaintiff was normal except for neurotremor in his outstretched arms. Ms. Valle's diagnoses were Anxiety Disorder and Benjodiazepine Dependence. She noted that the Plaintiff's medications were alprazolam (Xanax) and citalopram hydrobromide (Celexa). There was no mention of trazodone. (R:845-46)

On January 31, 2020, the Plaintiff presented to Alka Singal, M.D. at Henderson Behavioral Health (Henderson), where he had been receiving treatment for depression and insomnia. The Plaintiff complained that he was still depressed and wished to increase his depression medication. He was taking 300 mg of trazodone and 10 mg of Haldol, but had been unable to get more than 2-3 hours of sleep. The Plaintiff also had received an injection of Abilify, which helped with depression and psychosis, but had missed a follow-up appointment. The Plaintiff agreed to another injection. (R:861)

Dr. Singal observed that the Plaintiff's affect was gloomy and he appeared to be tired. He was well groomed and well dressed, as was oriented in all spheres. Mental status evaluation revealed that the Plaintiff's speech was coherent, but soft;

---

[1]. The record of this office visit does not identify Ms. Valle's professional title.

thought process was logical; associations were intact; judgment/insight was fair to poor; recent and remote memory was fair to poor; attention and concentration were fair; language and fund of knowledge were poor; mood was calm, and affect was depressed.  The Plaintiff denied visual and auditory hallucinations, delusions and suicidal/homicidal ideations. Dr. Singal determined to administer 3 Abilify injections, after which the doctor would review the Plaintiff's symptoms.  Dr. Singal noted that the Plaintiff was not fluent in English and was unable to communicate his symptoms and response to treatment or to understand what the doctor saying to him.  (R:861-63)

The Plaintiff returned to Dr. Singal on May 8, 2020, assisted by a Spanish translator.  Dr. Singal noted that the Plaintiff appeared calm, well groomed and tremulous.  The Plaintiff reported that his depression was so-so, but he felt anxious all the time and experienced paranoia in crowds.  He stated that in the past he had taken various medications for anxiety: propranalol had helped a little, while Buspar and Vistaril had been ineffective.  The doctor's report made no mention of alprazolam, which was identified by Ms. Valle as one of the Plaintiff's medications. Mental status examination results were the same as at the previous appointment in January except that the Plaintiff now admitted to delusions.  Dr. Singal's plan was to increase the Plaintiff's dosage of Celexa and continue with the Abilify injections.  If there was no improvement, the doctor would start the Plaintiff on propanalol.  (R:859-60)

On May 12, 2020, a Mental Residual Functional Capacity Assessment of the Plaintiff was performed by Richard Willens, Psy. D., a non-examining state agency psychologist.  In the area of understanding and memory, Dr. Willens opined that the Plaintiff was not significantly limited in the abilities to remember locations and work-like procedures and to understand and remember very short and simple instructions,

but was moderately limited in the ability to understand and remember detailed instructions. (R:97-98)

In the area of sustained concentration and persistence, Dr. Willens found that the Plaintiff had no significant limitations in the abilities to carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them, and make simple work-related decisions. However, the Plaintiff was moderately limited in his abilities to carry out detailed instructions; maintain attention and concentration for extended periods, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R:98)

In the area of social interaction, Dr. Willens assessed that the Plaintiff had no significant limitations in the abilities to ask simple questions or request assistance, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. He was moderately limited in the abilities to interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (R:98-99) Dr. Willens explained that the Plaintiff "may have some social limitations secondary to mood symptoms/anxiety/aggression/substance use and would do best in settings with limited social contact/demands." (R:99)

In the final area of adaptation, Dr. Willens determined that the Plaintiff had no significant limitations in the abilities to be aware of normal hazards and take

appropriate precautions; travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others.  The Plaintiff had moderate limitations in his ability to respond appropriately to changes in the workplace. (R:99) Dr. Willens summarized:

> Claimant can understand, retain and carry out simple instructions.   Claimant can consistently and usefully perform routine tasks on a sustained basis with minimal (normal) supervision.  Claimant has decreased ability to cooperate effectively with public and co-workers in completing simple tasks and transactions and will function best on tasks with limited social demands.  Claimant can adjust over time to the mental demand of most new task settings.

Id.  On July 14, 2020, Jessy Sadovnik, Psy.D., another state agency non-examining psychologist, made findings identical to those of Dr. Willens. (R:125-27)

On May 18, 2020, the Plaintiff returned to Ms. Valle for medication refills, requesting that his anxiety medication be changed to diazepam 10 mg.  The Plaintiff reported that he had been laid off from work and no longer was able to purchase alprazolam.  He also asked for a letter excusing him from work because of panic attacks and anxiety.  Additionally, the Plaintiff complained of lower back pain which had begun the preceding week. The Plaintiff reported that he was not working or driving and was going to apply for Social Security benefits. Once again physical examination was normal except for tremors in his outstretched arms. Ms. Valle made the requested medication change from alprazolam to diazepam 10 mg. (R: 843-44)

On July 31, 2020, the Plaintiff returned to Dr. Singal, again assisted by a translator.  He told the doctor that his depression was the same as previously but his hallucinations had gotten worse.  The Plaintiff stated that a month earlier he had begun to hear voices telling him to cut himself, but so far the Plaintiff had been able to resist following the voices.  He also had begun seeing shadows in his peripheral

vision.  The Plaintiff reported getting only 2-3 hours of sleep each night even after taking 300 mg of trazodone.  Despite these issues, the Plaintiff identified his primary problem as anxiety, and stated that Buspar has helped him in the past.  He complained that the increased dosage of Celexa had caused erectile dysfunction. The Plaintiff related that he did not like talking to people and only went out of his house for medical appointments.  (R:856)

Dr. Singal observed that the Plaintiff was well groomed, well dressed and overweight.  Speech was coherent; thought process was logical; associations and orientation were intact; judgment/insight, recent or remote memory and attention and concentration all were fair; language was poor, and mood was anxious.  After noting that the Plaintiff reported having taken 15 mg of Buspar three times per day in the past, Dr. Singal determined to start with 10 mg of Buspar three times per day.  The doctor also discontinued Celexa and gave the Plaintiff an Abilify injection.  (R:856-57)

On October 15, 2020, Dr. Arguello completed a Medical Assessment of Ability to Do Work Related Activities (Mental) pertaining to the Plaintiff.  She opined that in the area of making occupational adjustments, the Plaintiff had an unlimited/very good ability to follow work rules; a fair ability to interact with supervisors; and a poor or no ability to relate to co-workers, deal with the public, use judgment, deal with work stress, function independently or maintain attention/concentration.  She stated that the Plaintiff's concentration was impaired and he was unable to make decisions on his own.  The Plaintiff was fearful and suffered from racing thoughts as the result of his anxiety disorder.  (R:902)

In the area of making performance adjustments, Dr. Arguello assessed that the Plaintiff had a fair ability to understand, remember and carry out simple job instructions as well as detailed, but not complex job instructions.  However, the

Plaintiff had a poor or no ability to understand, remember and carry out complex job instructions. The doctor described the Plaintiff as having an impaired attention span and as fearful and shaking all the time. (R:903)

In the area of making personal social adjustments, Dr. Arguello believed that the Plaintiff had a good ability to maintain personal appearance; fair abilities to behave in an emotionally stable manner and demonstrate reliability, and a poor or no ability to relate predictably in social situations. The doctor stated that the Plaintiff's mental health had been deteriorating for the preceding three years, and he had been unable to work, was not driving and was incapable of interacting with others. Id.

In the area of other work-related activities, Dr. Arguello stated that the Plaintiff was fearful, isolated, had poor eye contact and was uneasy with interactions with others. She noted that the Plaintiff lived with his mother, and that the Plaintiff's symptoms had been present for the preceding three years. Dr. Arguello did not believe that the Plaintiff suffered from a substance addiction disorder and opined that he would be disabled even if he did not abuse alcohol or drugs. (R:904-905)

At the administrative hearing, the Plaintiff testified that he had not looked for work since 2013 because his mental health problems had worsened and he was unable to go out of his house. He acknowledged that he still was receiving mental health treatment at Henderson. The Plaintiff told the ALJ that the doctors at Henderson were aware that he was receiving benodiazepam from Dr. Arguello, who also was treating his mental health problems. (R:55)

The Plaintiff described his problems at work as the inability to recall work instructions and his phobia that the workers were making fun of him or hiding from him. Additionally, the Plaintiff stated he was unable to make judgments or decisions

about what to do.  The Plaintiff related that he suffered from panic attacks all the time. If he was in a public place and there were people there, he would begin to sweat, shake and tremble, and felt pain in his chest.  (R:56-57)

Carrie Anderson, a vocational expert (VE) classified the Plaintiff's past jobs as maintenance worker and porter, each with an exertional level of medium and an SVP of 2, and landscape laborer, with an exertional level of heavy and an SVP of 2. The VE was asked to consider an individual of the same age, education and work experience as the Plaintiff, who was capable of performing the full range of exertional demands of work, with the following limitations: he could understand, remember and carry out short and simple instructions that require little independent judgment or decision making; could tolerate occasional interaction with supervisors, co-workers and the public; could concentrate and persist to complete simple and routine tasks; would likely be off-task no more than 10% of the workday, and could adapt to occasional gradual routine and predictable workplace changes.  The VE testified that such a person could perform the Plaintiff's past jobs of porter and landscape laborer, but not the job of maintenance worker.  The VE stated that this person also could perform the jobs of packager, cleaner, and car detailer, each of which is classified as medium work with an SVP of 2 and exists in significant numbers in the national economy.  (R:59-63)

In response to a question posed by the Plaintiff's representative, the VE testified that if the same person were unable to maintain attention and concentration for 2-hour periods, there would be no jobs he could perform.  (R:65)

### III. DECISION OF THE ALJ

The ALJ began by finding that the Plaintiff met the insured status requirements of the Social Security Act through December 31, 2022; had not engaged in substantial gainful activity since his alleged onset date of February 5, 2020; had the

severe impairments of depression, anxiety and substance abuse disorder, and did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  In finding that the Plaintiff's mental impairment did not meet or equal a listing, the ALJ assessed that the Plaintiff had only moderate limitations in each of the four relevant areas: (1) understanding, remembering or applying information; (2) interacting with others; (3) concentrating, persisting or maintaining pace, and (4) adapting or managing himself. (R:17-19)

Next, the ALJ determined that the Plaintiff retained the residual functional capacity to perform a full range of work at all exertional levels with the following limitations: he could understand, remember and carry out short and simple instructions that require little independent judgment or decision-making; could tolerate occasional interaction with supervisors, co-workers and the public; could concentrate and persist to complete simple and routine tasks; would likely be off-task no more than 10% of the workday in addition to regular breaks, and could adapt to occasional, gradual, routine and predictable workplace changes.  (R:20)  After summarizing the Plaintiff's hearing testimony, the ALJ found that although the Plaintiff's medically determinable impairments reasonably could be expected to cause the symptoms he alleged, the Plaintiff's statements concerning the intensity, persistence and limited effects of those symptoms were not entirely consistent with the medical evidence and other evidence of record.  (R:20-21)

The ALJ pointed out that the treatment notes from Henderson showed that the Plaintiff had improved with medications and that he received no treatment other than medications.  Additionally, the Plaintiff had not psychiatric hospitalizations from the time of his alleged onset through the date of the decision.  The ALJ noted that

in January 2020, the Plaintiff admitted that the Abilify injection which he had received in September 2019 had significantly helped with his depression, but that  he  had failed to return to Dr. Singal for another injection.  At his January 2020  appointment, the Plaintiff claimed he could not sleep more than 2-3 hours despite taking trazodone and Haldol, and requested an increase in his medication for depression.  The ALJ emphasized that the record showed that  the  Plaintiff  had received the Abilify injection through a patient assistance program, so there was no issue of inability to pay.  (R:21)

The ALJ next discussed the Plaintiff's May 2020 visit to Henderson, where he complained of anxiety and paranoia, resulting in an increase in dosage of Celexa (later discontinued because of erectile dysfunction).  The Plaintiff's main complaint was anxiety, although he reported hearing voices on a daily basis which told him to cut himself, which the Plaintiff had been able to resist.  The Plaintiff claimed Buspar had helped him in the past, despite an earlier statement that neither Buspar nor Vistaril had been effective.  Accordingly, the Plaintiff was started on Buspar.  Id.

The ALJ pointed out that despite his mental health treatment at Henderson, the Plaintiff simultaneously obtained a benodiazepine prescription from his primary care provider for treatment of anxiety.  In June 2020, that prescription was changed from Xanax to diazepam because the Plaintiff reported that he had been laid off from work and could not longer purchase Xanax.  The ALJ acknowledged that the Plaintiff's earnings record did not confirm any work activities in 2020, possibly because earnings were unreported and/or in cash.  In any event, the ALJ found that the Plaintiff's reference to working was inconsistent with his request for disability. Id.

The ALJ observed that although the Plaintiff made some reports of medication side effects, none of his treatment records documented any side effects.

10

Additionally, the record was devoid of any recent, current or ongoing issues with illicit drug use, and the Plaintiff's' last short stay psychiatric/medical admission apparently had occurred in 2019. Although the notes from Henderson showed no concerns about drug or alcohol use, but notes from Dr. Arguello's office did show that the Plaintiff was benzodiazepine dependent. (R:22)

The ALJ noted that there were no mental health opinions from Henderson. Instead, the Plaintiff obtained a mental assessment from his primary care provider, Dr. Arguello. The ALJ found this opinion to be generally unpersuasive because Dr. Arguello was the Plaintiff's primary care physician rather than his main mental health provider, and because Dr. Arguello's office notes did not contain adequate objective data, such as mental status exams, to support her statements. The ALJ found that although Dr. Arguello may have established longitudinal treatment with the Plaintiff, the office notes clearly showed that his visits were routine in nature, involving for medication refills or requests for disability paperwork. Additionally, the ALJ pointed o9ut that most of Dr. Arguello's statements appeared to reflect the Plaintiff's subjective reports, such as his complaints of anxiety and inability to drive, rather than an objective assessment with supporting medical rationale. Nevertheless, Dr. Arguello's opinion that the Plaintiff was capable of performing simple tasks was consistent with other opinions in the record and supported by the mental examinations performed at Henderson. (R:22-23)

The ALJ found the opinions of the state agency psychological consultants to be persuasive because they were consistent with the medical records from Henderson and Dr. Arguello. Also, the non-examining psychologists were program specialists who had reviewed most of the Plaintiff's medical file. Although these consultants did not review the entire record, including evidence received at the

hearing level, that evidence did not significantly diminish their assessments. Additionally, based on the record as a whole, the ALJ determined that the Plaintiff's substance use history was immaterial.  (R:23)

The ALJ concluded that the residual functional capacity assessment was supported by the notes and objective exams at Henderson and the lack of ongoing or current use of drugs or alcohol (despite Dr. Arguello's diagnosis of benzodiazepine dependence, which the ALJ found to be immaterial to the issue of disability).  The ALJ stated that the residual functional capacity assessment also was consistent with the Plaintiff's ability to independently perform day-to-day activities, care for his personal needs, watch TV and seek proper mental health care, despite some noncompliance issues referenced earlier in the decision.  The Plaintiff's ability to interact with others and adapt to changes on an occasional basis was supported by the Plaintiff's interactions with his medical providers and with the ALJ at the hearing, when the Plaintiff showed patience and attention when waiting for translation by the interpreter.  In that regard, the interpreter had no difficulties in interacting with the Plaintiff.  Finally, the ALJ stated that the residual functional capacity assessment was consistent with the Plaintiff's medically managed psychiatric symptoms, the absence of hospitalizations from the February 2020 alleged onset date through the date of the decision, and the lack of any other mental health treatment, including therapy/counseling.  (R:23-24)

Based on the testimony of the VE, the ALJ found that the Plaintiff retained the residual functional capacity to perform his past jobs of porter and landscape laborer.  In addition, the Plaintiff could perform the jobs of packager, cleaner and car detailer, each of which exists in significant numbers in the national economy.

Accordingly, the ALJ concluded that the Plaintiff was not under a disability during the relevant time period.

## IV. <u>CROSS MOTIONS FOR SUMMARY JUDGMENT</u>

The Plaintiff seeks reversal or remand on three grounds: (1) the ALJ erred by failing to include in her residual functional capacity the fact that the Plaintiff is unable to communicate in English; (2) the ALJ failed to properly credit Dr. Arguello's opinion, and (3) the Plaintiff was denied his right to a hearing before an ALJ who had lawful authority to decide his claim because the statutory provision for removal of the Commissioner of Social Security is unconstitutional.

The Commissioner contends that the decision of the ALJ must be affirmed because it is supported by substantial evidence and the correct legal standards were applied.

## V. <u>RECOMMENDATIONS OF LAW</u>

At issue before the Court is whether the final decision of the Commissioner, as reflected by the record, is supported by substantial evidence. "Even if the evidence preponderates against the Secretary, we must affirm if the decision is supported by substantial evidence." <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1985). Substantial evidence is defined as such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389 (1971); <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233 (11th Cir. 1983). The Court must review the record as a whole to determine if the decision is supported by substantial evidence. <u>Bloodsworth</u>, 703 F.2d at 1239. The Court must also determine whether the Administrative Law Judge applied the proper legal standards. No presumption of validity attaches to the Commissioner's determination of the proper legal standards

to be applied.  <u>Davis v. Shalala</u>, 985 F.2d 528, 531 (11th Cir. 1993) (citing <u>Bridges v. Bowen</u>, 815 F.2d 622, 624 (11th Cir. 1987)).

In making a disability determination, the ALJ must perform the sequential evaluation outlined in 20 C.F.R. § 404.1520.  First the claimant must not be engaged in substantial gainful activity after the date the disability began.  Second, the claimant must provide evidence of a severe impairment.  Third, the claimant must show that the impairment meets or equals an impairment in Appendix 1 of the Regulations. If the claimant fails to provide sufficient evidence to accomplish step three, the analysis proceeds to step four.  In step four, the ALJ must determine the claimant's residual functional capacity, then determine if the claimant can perform his or her past relevant work.  The claimant has the burden of proving the inability to perform past relevant work. If the claimant's evidence shows an inability to perform past relevant work, the burden shifts to the ALJ in step five.  The ALJ must show that there is other gainful work in the national economy which the claimant can perform. Once the ALJ identifies such work, the burden returns to the claimant to prove his or her inability to  perform such work.

### A. <u>Inability to Communicate in English</u>

The Plaintiff first asserts that the ALJ erred by failing to include in her residual functional capacity assessment that the Plaintiff was unable to communicate in English.  The Plaintiff relies on 20 C.F.R. § 404.1564(b) for the proposition that the term "education" includes the ability to speak, read and understand English.  The Plaintiff notes that while the ALJ questioned him at the hearing about his education, he did not ask about his ability to speak English.

In response, the Commissioner points out that this regulation has been amended to eliminate any reference to the ability to speak, read and understand

English.  This was based on an agency finding that English language facility "is no longer a useful indicator of an individual's educational attainment or of the vocational impact of an individual's education because of changes in the national workforce since we adopted the current rule more than 40 years ago." 85 Fed. Reg. 10,586, 10,601 (Feb. 25, 2020).  The effective date of the amendment was April 27, 2020, and the agency determined that the amendment would apply "to claims that are pending on or after the effective date." SSR 20-1p, No. SSA-2017-0046, 2020 WL 1083309 (Mar. 9, 2020).

The  ALJ's decision in the instant case was rendered on November 30, 2020, some seven months after the effective date of the amendment.  The undersigned notes that the Plaintiff did not address this ground in his Response to the Commissioner's Motion for Summary Judgment, and the undersigned finds that the Plaintiff is not entitled to relief on his first asserted ground.

## B. Opinion of Dr. Arguello

The Plaintiff next contends that the ALJ did not give proper credit to the opinion of his primary care physician, Dr. Arguello.  For claims filed after March 27, 2017, 20 C.F.R. § 1520c(a) provides that no deference or specific evidentiary weight, including controlling weight, is to be given to any medical opinion or prior administrative finding, including those of a treating source.  Instead, each opinion or prior finding is evaluated by considering the factors set forth in § 1520c(c): (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of treatment relationship and examining relationship; (4) specialization, and (5) other factors, such as familiarity with the other evidence in the claim or an understanding of the program's policies and evidentiary requirements. Of these factors, the most important are supportability and consistency.  The regulations state that the "more consistent a medical opinion(s) or

prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 1520c(c)(2).

Here, the ALJ found Dr. Arguello's opinion to be generally unpersuasive because Dr. Arguello was the Plaintiff's primary care physician rather than his main mental health provider, and because Dr. Arguello's office notes did not contain adequate objective data, such as mental status exams, to support her statements. The ALJ found that although Dr. Arguello may have established longitudinal treatment with the Plaintiff, the office notes clearly showed that his visits were routine in nature, involving medication refills or requests for disability paperwork. Additionally, the ALJ pointed out that most of Dr. Arguello's statements appeared to reflect the Plaintiff's subjective reports, such as his complaints of anxiety and inability to drive, rather than an objective assessment with supporting medical rationale. Nevertheless, Dr. Arguello's opinion that the Plaintiff was capable of performing simple tasks was consistent with other opinions in the record and supported by the mental examinations performed at Henderson. The ALJ also pointed out that the record did not contain an opinion from Henderson, where the Plaintiff received specialized mental health treatment.

Thus, the ALJ specifically addressed the factors of supportability, consistency, relationship with the Plaintiff and specialization. Additionally, the ALJ stated that her own residual functional capacity assessment of the Plaintiff, which conflicted with that of Dr. Arguello, was supported by the notes and objective exams at Henderson and the lack of ongoing or current use of drugs or alcohol. The ALJ stated that her assessment also was consistent with the Plaintiff's ability to independently perform day-to-day activities, care for his personal needs, watch TV and

16

seek proper mental health care, despite some noncompliance issues.  The ALJ found that the Plaintiff's ability to interact with others and adapt to changes on an occasional basis was supported by the Plaintiff's interactions with his medical providers and with the ALJ at the hearing.  Finally, the ALJ stated that the residual functional capacity assessment was consistent with the Plaintiff's medically managed psychiatric symptoms, the absence of hospitalizations from the February 2020 alleged onset date through the date of the decision, and the lack of any other mental health treatment, including therapy and/or counseling.

Based on a review of the record as a whole, the undersigned finds that the ALJ complied with Social Security regulations in assessing the opinion of Dr. Arguello and that the ALJ's residual functional capacity assessment was supported by substantial evidence.  Accordingly, the Plaintiff is not entitled to reversal or remand on this ground.

## C. <u>Statutory Removal Provision</u>

The Plaintiff's final ground for relief is that he was denied his right to a legitimate and valid hearing because the statute governing the appointment of the Commissioner is unconstitutional and, as a result, the Commissioner's delegation of authority to the ALJ and the Appeals Council was invalid.  The Plaintiff contends that he was injured because he was denied his right to a valid administrative adjudicatory process, and seeks remand for a de novo hearing before a new ALJ.

The Plaintiff's argument rests on the Supreme Court's decisions in <u>Seila Law LLC v. Consumer Fin. Prot. Bureau</u>, 140 S. Ct. 2183 (2020) and <u>Collins v. Yellen</u>,141 S. Ct. 1761 (2021).  Both cases dealt with appointment procedures for agency heads which permitted the President to remove those individuals only for cause.  <u>Seila Law</u> dealt with the "for cause" removal restriction on the President's

power to remove the director of the Consumer Financial Protection Bureau (CFPB), holding that this provision violated constitutional separation of powers. However, the Court determined that the unconstitutional removal provision was severable from other provisions relating to the agency's structure.

Collins involved a similar restriction of the President's power to remove the director of the Federal Housing Finance Agency (FHFA). The Court found this provision likewise violated separation of powers, but again determined that the provision was severable. Accordingly, the Court held:

> All the officers who headed FHFA during the time in question were properly *appointed*. Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the FHFA . . . as void.

Collins, 141 S. Ct. at 1787 (emphasis in original).

The action challenged in Collins involved the transfer of billions of dollars in capital to the Department of the Treasury by Fannie Mae and Freddie Mac, which those companies sought to rescind. The Court held that the relief sought was unavailable because the action had been adopted by the Acting Director of the FHFA, who was removable at will. However, the Court also held that the aggrieved parties could be entitled to some form of retrospective relief if they could show that they were directly harmed by unconstitutional removal provision:

> Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in his way. In those situations, the statutory provision would clearly cause harm.

Collins, 141 S. Ct. at 1789.  Because the parties disputed whether such a situation existed. the Supreme Court remanded the case for further proceedings.  Id.

In the instant case, the Plaintiff contends that the removal provision applicable to former Commissioner of Social Security Andrew Saul, 42 U.S.C. § 902(a)(3), also violates separation of powers.  That section states that the Commissioner is appointed to a six-year term and may only be removed from office "pursuant to a finding by the President of neglect of duty or malfeasance in office."  The Commissioner concedes that § 902(a)(3) violates the separation of powers to the extent that it is construed as limiting the President's authority to remove the Commissioner without cause.  Nevertheless, the Commissioner advances two primary arguments against the Plaintiff's position: (1) the ALJ who issued the decision in the Plaintiff's case was not appointed by a Commissioner subject to the § 902(a)(3), since the ALJ's appointment was ratified by an Acting Commissioner who was not subject to the provision, and (2) the Plaintiff has not demonstrated any harm resulting from the removal provision.[2]

The Plaintiff has not cited any case which has adopted his position, and the undersigned could not locate any.  In Stanfird v. Kijakazi, No. 20-cv-1630-GPC (BLM), 2021 WL 5634177, *4 (S.D. Cal. Dec. 1, 2021) and Perez Kocher v. Comm'r of Soc. Sec., 6:20-cv-2357-GKS-EJK, 2021 WL 6334838, *5-6 (M.D. Fla. Nov. 23, 2021), the courts accepted the Commissioner's argument that no relief was warranted because the ALJ who rendered the unfavorable decision in question had been re-appointed by Acting Commissioner Nancy Berryhill.  The undersigned agrees with this conclusion

---

2. The Commissioner cites additional doctrines in response to the Plaintiff's position: harmless error, de facto officer, the rule of necessity and broad prudential considerations.  Since the undersigned agrees with the Commissioner's two primary arguments, these doctrines will not be addressed.

and finds that it applies to the Plaintiff because the appointment of the ALJ in his case had been ratified by Acting Commissioner Berryhill.

Other cases uniformly have denied relief because the plaintiffs could not demonstrate any harm caused to them by the removal provision.  See, e.g., Carolyn M.D. v. Kijakazi, No. 2:20-cv-06725-AFM, 2021 WL 6135322, *12 (C.D. Cal. Dec. 28, 2021); Rhonda Lynn Tibbetts v. Comm'r of Soc. Sec., No. 2:20-cv-872-SPC-MRM, 2021 WL 6297530, *6 (M.D. Fla. Dec. 21, 2021); Michele T. v. Comm'r of Soc. Sec., No. 3:20-cv-06085-JRC, 2021 WL 5356721, * 5-6 (W.D. Washington, Nov. 17, 2021).  In this regard, the Court in Michele T., 2021 WL 5356721, * 5, noted:

> [T]here is nothing showing the Commissioner or the SSA implemented new and relevant agency action that may have turned upon the President's inability to remove the Commissioner.  Plaintiff has not identified any new regulations, agency policies or directives Commissioner Saul installed that may have affected her claims. . . .
>
> There is also nothing showing former President Trump would have removed Commissioner Saul and appointed a new Commissioner who would have administered this plaintiff's claims differently.

The harm identified by the Plaintiff in the instant case is the fact that he received unfavorable decisions from an ALJ and Appeals Council pursuant to delegation of duties to those officers by Commissioner Saul, who was operating under an unconstitutional removal clause. Clearly this is not sufficient, as it would apply to virtually every disability case since the enactment of § 902(a)(3) and would render meaningless Collins' requirement of direct harm. See, Carolyn M.D., 2021 WL 6135322, *12.[3]  The Plaintiff has failed to demonstrate that the removal provision had any

---

3. The fact that President Biden removed Commissioner Saul does not change this analysis.

actual or possible impact on the unfavorable decision he received, and no relief is warranted on this ground. Therefore, the decision of the ALJ should not be disturbed.

## VI. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the Plaintiff's Motion for Summary Judgment be DENIED and the Commissioner's Motion for Summary Judgment be GRANTED.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable William P. Dimitrouleas, United States District Judge. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained therein, except upon grounds of plain error if necessary in the interest of justice. See 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140, 149 (1985); Henley v. Johnson, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 11th day of March, 2022.

_____
LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

All Counsel of Record